Gary L. PENICK et al.,
Plaintiffs-Appellees,

v.

COLUMBUS BOARD OF EDUCATION et al., and The Ohio State Board of Education et al., Defendants-Appellants.

Nos. 77–3365, 77–3366, 77–3490, 77–3491 & 77–3553.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 15, 1978.

Decided July 14, 1978.

ton, Mass., Richard M. Stein, Bell, White, Stein, Dachner & Ross, Columbus, Ohio, Leo P. Ross, Columbus, Ohio, Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, Thomas P. Michael, Alexander, Ebinger, Holschuh, Fisher & McAlister, Columbus, Ohio, William J. Brown, Atty. Gen. of Ohio, Roy Martin, Asst. Atty. Gen., Columbus, Ohio, Edward J. Cox, Leonard J. Schwartz, Robert K. Hammersmith, Columbus, Ohio, Paul R. Dimond, O'Brien, Moran & Dimond, Ann Arbor, Mich., for plaintiffs-appellees in No. 77–3365.

Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, Richard S. Walinski, Chief Counsel, Office of Atty. Gen., Columbus, Ohio, for defendants-appellants in No. 77–3366.

Richard M. Stein, Bell, White, Stein, Dachner & Ross, Leo P. Ross, Columbus, Ohio, Samuel H. Porter, Allan E. Roth, Curtis A. Loveland, William J. Kelly, Jr., Porter, Stanley, Platt & Arthur, Columbus, Ohio, Louis R. Lucas, Memphis, Tenn., Nathaniel R. Jones, New York City, Thomas I. Atkins, Boston, Mass., Thomas P. Michael, Alexander, Ebinger, Holschuh, Fisher & McAlister, Columbus, Ohio, William J. Brown, Atty. Gen. of Ohio, James W. McCarthy, Terry L. Tataru, Asst. Attys. Gen., Columbus, Ohio, Edward J. Cox, Columbus, Ohio, Robert K. Hammersmith, Columbus, Ohio, Paul R. Dimond, O'Brien, Moran & Dimond, Ann Arbor, Mich., for plaintiffs-appellees in No. 77–3366.

Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., Thomas I. Atkins, Boston, Mass., Richard M. Stein, Bell, White, Stein, Dachner & Ross, Columbus, Ohio, Leo P. Ross, Columbus, Ohio, Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, Thomas P. Michael, Alexander, Ebinger, Holschuh, Fisher & McAlister, Columbus, Ohio, Robert K. Hammersmith, Columbus, Ohio, Edward J. Cox, Columbus, Ohio, William J. Brown, Atty. Gen. of Ohio, Columbus, Ohio, Roy Martin, James W. McCarthy and Terry L.

Allan E. Roth, Samuel H. Porter, Curtis A. Loveland, William J. Kelly, Jr., Porter, Stanley, Platt & Arthur, Columbus, Ohio, for defendants-appellants in Nos. 77–3365, 77–3490.

Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., Thomas I. Atkins, Bos-

Tataru, Asst. Attys. Gen., Paul R. Dimond, O'Brien, Moran & Dimond, Ann Arbor, Mich., for plaintiffs-appellees in No. 77–3490.

Mark O'Neill, James L. McCrystal, Jr., Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, Thomas P. Michael, Alexander, Ebinger, Holschuh, Fisher & McAlister, Leonard J. Schwartz, Schwartz and Fishman, Leo P. Ross, Columbus, Ohio, Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, Robert K. Hammersmith, Edward J. Cox, Columbus, Ohio, William J. Brown, Atty. Gen. of Ohio, Columbus, Ohio, Richard S. Walinski, Chief Counsel, Roy Martin, James W. McCarthy and Terry Tataru, Asst. Attys. Gen., Allan E. Roth, Porter, Wright, Morris & Arthur, Columbus, Ohio, Samuel H. Porter, Curtis A. Loveland, William J. Kelly, Jr., Paul R. Dimond, O'Brien, Moran & Dimond, Ann Arbor, Mich., for defendants-appellants in No. 77–3491.

Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., Thomas I. Atkins, Boston, Mass., Richard M. Stein, Bell, White, Stein, Dachner & Ross, Columbus, Ohio, for plaintiffs-appellees in No. 77–3491.

Samuel H. Porter, Curtis A. Loveland, Allan E. Roth, William J. Kelly, Jr., Porter, Wright, Morris & Arthur, Leonard J. Schwartz, Andrew M. Fishman, Schwartz & Fishman, Leo P. Ross, Columbus, Ohio, Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, Robert K. Hammersmith, Edward J. Cox, Columbus, Ohio, Paul R. Dimond, O'Brien, Moran & Dimond, Ann Arbor, Mich., Mark O'Neill, James L. McCrystal, Jr., Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, Thomas P. Michael, Alexander, Ebinger, Holschuh, Fisher & McAlister, Columbus, Ohio, William J. Brown, Atty. Gen. of Ohio, Columbus, Ohio, for defendants-appellants in No. 77–3553.

Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., Thomas I. Atkins, Boston, Mass., Richard M. Stein, Bell, White, Stein, Dachner & Ross, Columbus, Ohio, for plaintiffs-appellees in No. 77–3553.

Before EDWARDS, LIVELY and MERRITT, Circuit Judges.

EDWARDS, Circuit Judge.

This is a case wherein the complaints charge racial discrimination in violation of the United States Constitution in the city school system of Columbus, the capital city of Ohio. After a 36-day trial, the District Judge found intentional de jure segregation and a dual school system separated by race in Columbus in 1954 when *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), was decided. He found that the Columbus School Board had failed in its duty to desegregate the school system and, on the contrary, had intentionally continued segregation in the two decades following *Brown.* He held that the State Board of Education had the duty to order desegregation of the Columbus system, but had not done so, and, on the contrary, had continued financial support to the segregated system in violation of both Ohio law and the federal constitution. He ordered systemwide desegregation and certified the critical questions for appellate review.

After review of this 6,600 page record, we accept the District Judge's findings of fact as not clearly erroneous and affirm his judgments of law. As to the State Board only, we remand for further consideration.

## I BACKGROUND

It was there from the beginning—the notion of equality before the law. The second sentence of the Declaration of Independence of the United States runs, "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness."

There, from the very beginning also, was the notion of a written constitution as fundamental law. In 1787[1] our people com-

---

1. The United States Constitution was adopted by the Constitutional Convention meeting in Philadelphia in 1787 and became effective when ratified by the ninth of the constituent states on June 21, 1788.

mitted the new nation to constitutional government to a greater degree than any other in the world. In adopting the Constitution of the United States, our ancestors made it the supreme law of the land [2] controlling the decisions of the President of the United States, the United States Congress, and the United States courts, as well as the governors, legislatures and courts of the several states. The United States Supreme Court has the duty to interpret the United States Constitution.[3] All judges in the land, including, of course, this court, are bound to follow its interpretation.[4]

At the Philadelphia convention also, our ancestors wrote a considerable portion of the concept of equality into the Constitution of the new country. In Article IV, section 2, clause 1: "The Citizens of each State shall be entitled to all the Privileges and Immunities of Citizens in the several States." Just four years later the people of the new country, through Congress and the state conventions, enacted Amendment V of the Bill of Rights, which contained another fundamental aspect of the general concept: "No person shall . . . be deprived of life, liberty, or property, without due process of law; . . ."

Although from the beginning the word "person" in the United States Constitution appeared to include slaves, the Constitution also contained specific recognition of the existence of slavery in a number of states. *See* U.S.Const. art. IV, § 2, cl. 3. When the great and bitter conflict over slavery developed, it found the courts holding that the constitutional principles cited above applied to the federal government, but not to the states which chose to sanction slavery. *See*

*Barron v. Mayor and City Council of Baltimore,* 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833); *Scott v. Sandford,* 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857).

The Civil War, in which 550,000 men died, was fought in large measure over the slavery question. At its end Congress and the required number of states adopted the Thirteenth Amendment to abolish slavery. Two years later Congress had been made intensely aware that many Southern states were passing laws to continue the subjugation of former slaves by statutes aimed directly at them. It was then that the Fourteenth Amendment was born. Ratified in 1868, it read in applicable part:

"SECTION 1. All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the *equal protection of the laws.*"

U.S.Const. amend. XIV, § 1 (emphasis added).

The language of the last sentence of Section 1 was drafted by one of Ohio's most famous Representatives, Congressman John Bingham. It was designed by its author to prevent the states from adopting state laws which deprived former black slaves and their progeny of rights equal to those of white citizens.[5] Bingham applied the prin-

---

**2.** The supremacy clause provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
U.S.Const., art. VI, cl. 2.

**3.** *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

**4.** *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816).

**5.** Bingham, speaking just before the vote in Congress on the Fourteenth Amendment:

"The necessity for the first section of this amendment to the Constitution, Mr. Speaker, is one of the lessons that have been taught to your committee and taught to all the people of this country by the history of the past four years of terrific conflict—that history in which God is, and in which He teaches the

ciples of Article IV, section 2 and the due process clause of the Fifth Amendment to the states and added the prohibition against any law denying any person "the equal protection of the laws."

The constitutional intention of 1868, as Bingham and his associates understood it (much as the United States Supreme Court does today), was not followed for many years. In the post-Reconstruction era black citizens in the Southern states (frequently in the Northern also) were denied access equal to that of whites to such fundamentals of "life, liberty and the pursuit of happiness" as votes, public accommodations, housing, jobs and schools. In 1896 this post-slavery system of segregation by race was validated by the United States Supreme Court as to public accommodations on railroads on the theory that the accommodations provided were "separate but equal." *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). By a six sentence dictum the opinion of the *Plessy* court seemed to apply the same rule to public schools.

For over a half century the *Plessy* dictum allowed separate public schools for blacks and whites to be established by state law or by school board authority without court interference. The record also demonstrated over and over that "separate" the schools were for black and white children, but "equal" they were not. In the 1930's and 1940's a series of cases brought before the United States Supreme Court the glaring inequities which existed between higher educational opportunities for whites and those for blacks. *Missouri ex rel. Gaines v. Canada,* 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208

(1938); *Sipuel v. Board of Regents,* 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247 (1948); *Sweatt v. Painter,* 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); *McLaurin v. Oklahoma State Regents,* 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950).

The Supreme Court in response ordered relief in every case and in *Sweatt v. Painter, supra,* it indicated that it reserved decision on the *Plessy* doctrine of separateness as applied to public schools.

The ultimate challenge came in five cases from separate sections of the country—Topeka, Kansas; New Castle County, Delaware; the District of Columbia; Prince Edward County, Virginia; and Clarendon County, South Carolina. During three years of argument and reargument by many of the finest lawyers in the land, the justices, most of whom had written or joined opinions which followed the *Plessy* doctrine, weighed the momentous issue. The decision finally came in a unanimous opinion written by Chief Justice Warren, *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). It held that public school separation by race imposed by law violated the United States Constitution's guarantee of "the equal protection of the laws." The date was May 17, 1954. This was 24 years ago.

## II THE LAW APPLICABLE TO THIS CASE

The Supreme Court opinion in *Brown I,* noting that in 1868 public education was in its infancy, did not resolve the question of whether those who wrote and adopted the Fourteenth Amendment intended its appli-

---

profoundest lessons to men and nations. There was a want hitherto, and there remains a want now, in the Constitution of our country, which the proposed amendment will supply. What is that? It is the power in the people, the whole people of the United States, by express authority of the Constitution to do that by congressional enactment which hitherto they have not had the power to do, and have never even attempted to do; that is, to protect by national law the privileges and immunities of all the citizens of the Republic and the inborn rights of every person within its jurisdiction whenever the same

shall be abridged or denied by the unconstitutional acts of any State.

"Allow me, Mr. Speaker, in passing, to say that this amendment takes from no State any right that ever pertained to it. No State ever had the right, under the forms of law or otherwise, to deny to any freeman the equal protection of the laws or to abridge the privileges or immunities of any citizen of the Republic, although many of them have assumed and exercised the power, and that without remedy."

Cong.Globe, 39th Cong., 1st Sess. 2542.

cation to public schools. Nor did it rely directly upon the inequalities which had characterized the separate black and white schools in the interim. It held that the general constitutional guarantee of "equal protection of the laws" must be applied to the system of public education which had developed in the interim between 1868 and 1954.

The language of the opinion was simple and direct. The opinion of the Court in *Brown v. Board of Education,* (henceforth *Brown I, supra*) said:

"We must consider public education in the light of its full development and its present place in American life throughout the Nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws.

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

"We come then to the question presented: Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities? We believe that it does."

*Id.* at 492–93, 74 S.Ct. at 691.

The opinion of the Court then proceeded to overrule *Plessy v. Ferguson, supra.* The dispositive sentences were:

"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment."

*Brown I, supra* at 495, 74 S.Ct. at 692.

Twelve years later, after great resistance to desegregation and many delays in carrying out the Supreme Court's ruling, the Court handed down *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The opinion by Justice Marshall said:

"The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now."*

*Id.* at 439, 88 S.Ct. at 1694 (emphasis in original).

Three years later, Chief Justice Burger (again for a unanimous Court) wrote in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971):

"The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation.

*Id.* at 15, 91 S.Ct. at 1275.

\* \* \* \* \* \*

"In *Green,* we pointed out that existing policy and practice with regard to faculty, staff, transportation, extracurricular activities, and facilities were among the most important indicia of a segregated system. 391 U.S., at 435, [88 S.Ct. 1689]. Independent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of

violation of substantive constitutional rights under the Equal Protection Clause is shown."

*Id.* at 18, 91 S.Ct. at 1277.

In *Swann* the District Judge's opinion referred to a white/black ratio of 71–29%. As to this the opinion of the Court said:

"If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

"We see therefore that the use made of mathematical ratios was no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement. From that starting point the District Court proceeded to frame a decree that was within its discretionary powers, as an equitable remedy for the particular circumstances. As we said in *Green,* a school authority's remedial plan or a district court's remedial decree is to be judged by its effectiveness. Awareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations. In sum, the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court."

*Id.* at 25, 91 S.Ct. at 1280 (footnote omitted).

Chief Justice Burger then turned to the publicly disputed question of bus transportation as part of a desegregation plan:

"The importance of bus transportation as a normal and accepted tool of education policy is readily discernible in this and the companion case, *Davis* [402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577], *supra.* The Charlotte school authorities did not purport to assign students on the basis of geographically drawn zones until 1965 and then they allowed almost unlimited transfer privileges. The District Court's conclusion that assignment of children to the school nearest their home serving their grade would not produce an effective dismantling of the dual system is supported by the record."

*Id.* at 29–30, 91 S.Ct. at 1282–1283 (footnote omitted).

The *Swann* opinion dealt more thoroughly than any other opinion of the Court with the method of proof of constitutional violations and the Court's remedial powers when such violations were found. It will be quoted extensively later in this opinion. For the moment, we conclude this digest of *Swann* with two of Chief Justice Burger's most meaningful sentences:

"As with any equity case, the nature of the violation determines the scope of the remedy. In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system."

*Id.* at 16, 91 S.Ct. at 1276.

Until the 1970's school desegregation cases were largely limited to Southern states. Then came a case where unconstitutional segregation had been found in the Park Hill district of Denver, Colorado. In *Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), Justice Brennan wrote:

"Nevertheless, where plaintiffs prove that the school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system, it is only common sense to conclude that there exists a predicate for a finding of the existence of a dual school system. Several considerations support this conclusion. First, it is obvious that a practice of concentrating Negroes in certain schools by structuring attendance zones or designating 'feeder' schools on the basis of race has the reciprocal effect of keeping other nearby schools predominantly white. Similarly, the practice of building a school—such as the Barrett Elementary School in this

case—to a certain size and in a certain location, 'with conscious knowledge that it would be a segregated school,' 303 F.Supp. [279], at 285, has a substantial reciprocal effect on the racial composition of other nearby schools."

*Id.* at 201–02, 93 S.Ct. at 2694 (footnote omitted).

\* \* \* \* \* \*

"In short, common sense dictates the conclusion that racially inspired school board actions have an impact beyond the particular schools that are the subjects of those actions."

*Id.* at 203, 93 S.Ct. at 2695.

\* \* \* \* \* \*

"[W]e hold that a finding of intentionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions."

*Id.* at 208, 93 S.Ct. at 2697.

The importance of intentional discrimination, as opposed to discriminatory impact from racially neutral causes, was further emphasized by the Supreme Court in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), where the Court, in an employment discrimination case, said:

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups. *Bolling v. Sharpe,* 347 U.S. 497 [74 S.Ct. 693, 98 L.Ed. 884] (1954). But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact."

*Id.* at 239, 96 S.Ct. at 2047 (emphasis in original).

Finally, for this brief review, in *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), the Supreme Court reemphasized the component of intentional discrimination which had been stressed in *Keyes* and the necessity for matching the scope of the remedy to the nature of the violation which had been outlined in *Swann* :

"The duty of both the District Court and the Court of Appeals in a case such as this, where mandatory segregation by law of the races in the schools has long since ceased, is to first determine whether there was any action in the conduct of the business of the school board which was intended to, and did in fact, discriminate against minority pupils, teachers, or staff. *Washington v. Davis, supra.* All parties should be free to introduce such additional testimony and other evidence as the District Court may deem appropriate. If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy. *Keyes,* 413 U.S., at 213 [93 S.Ct. 2686]."

*Dayton, supra* at 420, 97 S.Ct. at 2775.

We note that in the *Dayton* case Justice Rehnquist's opinion cites with approval every case except one which we have quoted above. Indeed, in the long history of the United States Supreme Court desegregation law which has been written since 1954, no case has purported to overrule or cast in

doubt any of the prior precedents which began with *Brown v. Board of Education.*

## III STATEMENT OF THIS CASE

Plaintiffs-appellants in this appeal are two groups of parents of children who filed complaints contending that their children (and all other children in the Columbus schools) had been deprived of their constitutional right to equal protection of the law by intentional racial segregation in the public schools of Columbus. Defendants-appellants are the Columbus Board of Education and the Ohio State Board of Education. Both defendants by pleadings and evidence at trial denied any intentional segregation in violation of the Constitution and claimed that any school segregation which existed at the time of the filing of the case was due to segregated housing patterns over which they had no control, or due to a "neighborhood" school policy which they claimed to be constitutionally permissible.

After a lengthy trial, United States District Judge Robert Duncan entered an Opinion and Order, dated March 8, 1977. *Penick v. Columbus Board of Education,* 429 F.Supp. 229 (S.D.Ohio 1977). The most succinct finding of fact in his lengthy analysis of the 6,600 pages of evidence is as follows:

"[D]uring the 1975–76 school year, when this case was tried, 70.4% of all the students in the Columbus Public Schools attended schools which were 80–100% populated by either black or white students; 73.3% of the black administrators were assigned to schools with 70–100% black student bodies; and 95.7% of the 92 schools which were 80–100% white had no black administrators assigned to them." *Id.* at 240.

The District Judge reviewed the history of Ohio's school laws and the Columbus School Board's administration of its schools from 1868 to 1954 when *Brown I* was decided. He found from the evidence that in 1954 the Columbus Board was maintaining five schools which had been built and operated as "black" schools. He found that, aside from one brief period, black Students

had been intentionally segregated. He held that "in 1954 there was not a unitary school system in Columbus." 429 F.Supp. at 236.

In detailed review of the actions of the Columbus Board in the post-1954 period, the District Judge found that by building schools at locations which would guarantee their opening as "one-race schools," gerrymandering school districts on a racial basis, allowing optional assignment of white students to white schools and assigning black teachers and administrative personnel to black schools in the great majority of instances and white teachers and administrative personnel to white schools in the majority of instances, the Board had not followed a "racially neutral" policy, but to the contrary, had intentionally chosen alternatives which were predictably segregative and from which it was reasonable to infer segregative intent. As to the Columbus Board, Judge Duncan entered the following finding of segregative intent:

"From the evidence adduced at trial, the Court has found earlier in this opinion that the Columbus Public Schools were openly and intentionally segregated on the basis of race when *Brown I* was decided in 1954. The Court has found that the Columbus Board of Education never actively set out to dismantle this dual system. The Court has found that until legal action was initiated by the Columbus Area Civil Rights Council, the Columbus Board did not assign teachers and administrators to Columbus schools at random, without regard for the racial composition of the student enrollment at those schools. The Columbus Board even in very recent times, has approved optional attendance zones, discontiguous attendance areas and boundary changes which have maintained and enhanced racial imbalance in the Columbus Public Schools. The Board, even in very recent times and after promising to do otherwise, has abjured workable suggestions for improving the racial balance of city schools.

"Viewed in the context of segregative optional attendance zones, segregative

faculty and administrative hiring and assignments, and the other such actions and decisions of the Columbus Board of Education in recent and remote history, it is fair and reasonable to draw an inference of segregative intent from the Board's actions and omissions discussed in this opinion."

429 F.Supp. at 260–61.

In this same opinion the District Judge analyzed the legal responsibilities of the State Board of Education and found a failure to act when the State Board had a clear legal duty to act to prevent the creation and continuation of segregation in the Columbus schools. The District Judge found intentional violation of the Constitution on the part of the State defendants in the following paragraph:

"The failure of these state defendants to act, with full knowledge of the results of such failure, provides a factual basis for the inference that they intended to accept the Columbus defendants' acts, and thus shared their intent to segregate in violation of a constitutional duty to do otherwise."

*Id.* at 263–64.

The District Judge thereupon entered an order permanently enjoining the Columbus Board of Education and the State Board from "creating, promoting, or maintaining unconstitutional racial segregation in any Columbus school facilities" and directing the Columbus Board of Education and the State Board "to formulate and submit to the Court proposed plans for the desegregation of the Columbus Public Schools . . . ." *Id.* at 268.

Before such plans were acted upon by the District Judge, the Supreme Court of the United States decided the case of *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). On the heels of that case, the Columbus Board of Education moved for leave to amend its previously proposed remedy plan and sought the court's reconsideration of the District Judge's previous findings concerning constitutional violation. After reviewing the specific language employed by the opinion of the Court in the *Dayton* case and distinguishing the facts as he saw them in the Columbus case from the facts recited by the Supreme Court in relation to *Dayton,* the District Judge reiterated his findings of de jure and intentional systemwide segregation. Without approving any plan which had been submitted either by the Columbus Board or the State Board, but expressing a preference for the State Board plan, the District Judge outlined a series of principles for the parties to follow in desegregating the Columbus school system. The first sentence read: "The plan must be capable of desegregating the entire Columbus school system." He then certified the various orders to which we have referred as presenting controlling questions of law as to which there are substantial grounds for differences of opinion, and further certified that immediate appellate review might materially advance ultimate termination of the litigation. These appeals followed, with appellants contesting most of the findings and legal conclusions of the District Judge.

We review the findings of fact and conclusions of law of the District Judge in this case against the statements of law by the Supreme Court of the United States in the preceding section, which we believe control our decision.

## IV THE COLUMBUS SCHOOLS BEFORE 1954

The first question which Judge Duncan dealt with in his opinion was "whether [the Columbus school system] was unitary (no unlawful racial segregation) or dual (unlawful racial separation)" in 1954 when the United States Supreme Court decided *Brown v. Board of Education, supra.* 429 F.Supp. at 234. He held that in 1954 the system was unlawful and dual. His careful analysis bears quotation:

"Prior to 1871, the evidence indicates not only a complete separation of the races in the Columbus school system, but also repeated demands by black citizens for adequate schools for black children.[1]

[1] See, *e. g., Early Black History in the Columbus Public Schools,* by Myron T. Seifert, historian

for the Columbus Public Schools, admitted at trial as plaintiffs' exhibit 351.

"In 1871 the Supreme Court of Ohio decided the case *State ex rel. Garnes v. McCann*, 21 Ohio St. 198. In that case, a black parent challenged an Ohio statute which 'authorized and required' all the boards of education in the state 'to establish, within their respective jurisdictions, one or more separate schools for colored children, when the whole number, by enumeration, exceeds twenty. . . .' The statute is quoted in the Supreme Court's opinion, 21 Ohio St. at 206. Recognizing that blacks in the post Civil War era were entitled to protection under the Fourteenth Amendment to the United States Constitution, the Supreme Court of Ohio nevertheless held that the statute providing for separate schools for black children affronted neither the United States nor the Ohio Constitution. Thereafter, in 1878, the General Assembly of Ohio enacted House Bill No. 105, 75 Ohio L. 513, which provided that 'where in their judgment it may be for the advantage of the district to do so, [local boards of education] may organize separate schools for colored children. . . .' This statute in turn was repealed in 1887, 84 Ohio L. 34. In passing on the state of the law effective in 1888, the Supreme Court of Ohio held that Boards of Education could not maintain separate schools for black and white students. *Board of Education v. State*, 45 Ohio St. 555 [16 N.E. 373] (1888).

"It was 1878 before the first black person graduated from high school in Columbus. In that year all black children attended Loving School at the corner of Long and Third Streets, many passing closer white schools en route. In 1879 a very few blacks attended Second Avenue, Douglas and East Friend schools. However, with only these few exceptions, blacks attended Loving School.

"In 1881 by resolution the Columbus Board abolished separate schools for black children. Children were assigned to attend school districts where they dwelt. Miss Celia Davis, a black woman, taught at the racially mixed Medary school in 1897. Several other blacks taught in mixed schools during the period 1900–1907.

"The Columbus Board of Education caused the Champion Avenue School to be built in 1909. The school, located in a predominantly black residential district, was staffed with all black teachers. In August, 1909, Charles W. Smith, a black parent, sued the Columbus Board of Education in the Common Pleas Court of Franklin County, alleging that the Board's action establishing Champion as a black school was illegal under Ohio law. The Court of Common Pleas heard evidence, and on March 11, 1911, dismissed the case. Mr. Smith appealed the dismissal, and on December 31, 1912, the Circuit Court of Franklin County in Case No. 3094 affirmed the trial court's action. On January 6, 1913, Dr. William O. Thompson, one of the members of the Columbus Board of Education, reported to the Board that the Circuit Court had 'affirmed the opinion of Judge Rogers, and further held that the creation of a school district is a matter of the discretion of the Board of Education, and not a subject for judicial determination, and dismissed the appeal.' Apparently the trend earlier established toward integration then halted in Columbus.

"During the 1920's and early 1930's Champion remained a school populated by black students with predominantly black faculty and a black principal. Although some secondary and elementary schools were attended by both races, all of the black teachers employed in the system were at Champion.

"In 1938 Pilgrim Junior High, which had been a racially mixed school, was converted to an elementary school. Champion's then all-black elementary faculty was transferred to Pilgrim and Champion became a junior high school with a black faculty and black students. The school attendance areas were gerrymandered so that white students who lived very near Pilgrim School were permitted to attend Fair Avenue School, which was considerably more distant from their houses on Greenway and Taylor Avenues. White children who lived on those streets had attended Pilgrim be-

fore it was converted to an elementary school for black children.

"In 1941 all black teachers in the system were employed at Mt. Vernon, Garfield, Pilgrim or Champion Schools, all predominantly black schools. By 1943 five schools were attended almost exclusively by black children, and the faculties of each were composed entirely of black teachers. In September of that year the entire professional staff of Felton School, composed of 13 teachers and a principal, was removed and replaced with 14 black persons. The same kind of 100% white to 100% black faculty transfer had occurred at the Mt. Vernon and Garfield schools in prior years. In September, 1943, the Vanguard League, a civil rights organization, complained to the Columbus Board about gerrymandering as follows:

"A more striking example of such gerrymandering is Taylor and Woodland Avenues between Long Street and Greenway. Here we find the school districts skipping about as capriciously as a young child at play. The west side of Taylor Avenue (colored residents) is in Pilgrim elementary district and Champion for Junior High. The east side of Taylor (white families) is in Fair Avenue elementary district and Franklin for Junior High.

"Both sides of Woodland Avenue between Long and Greenway are occupied by white families and are, therefore, in the Fair Avenue-Franklin district. Both sides of this same street between 340 and 500 are occupied by colored families and are in the Pilgrim-Champion, or "colored" school, district. White families occupy the residences between 500 and 940, and, as would be expected, the "white" school district of Shepard-Franklin applies.

"When Brown I was decided in 1954, there were no black high school principals in Columbus. All black administrators were assigned to predominantly black schools. There were no white principals in predominantly black schools. Under the policy and practice of the Columbus defendants' predecessors, black student teachers were required to do their student teaching at predominantly black schools.

"Giving full recognition to substantial racial mixing of both students and faculty in some schools, the Columbus school system cannot reasonably be said to have been a racially neutral system on May 17, 1954. The then-existing racial separation was the direct result of cognitive acts or omissions of those school board members and administrators who had originally intentionally caused and later perpetuated the racial isolation, in the east area of the district, of black children and faculty at Champion, Mt. Vernon, Garfield, Felton and Pilgrim. Thus, the Columbus Board of Education maintained what amounted to an enclave of separate, black schools on the near east side of Columbus, thereby depriving hundreds of black children an opportunity for an integrated educational experience. Defendants do not appear to assert that these results were an accommodation to the neighborhood school concept.

"In the Court's view, in 1954 the Columbus defendants' predecessors had caused some black children to be educated in schools that were predominantly white; however, the Board also deliberately caused at least five schools to be overwhelmingly black schools, while drawing some attendance zones to allow white students to avoid these black schools. This separateness cannot be said to have been the result of racially neutral official acts. As a result, in 1954 there was not a unitary school system in Columbus."

429 F.Supp. at 234–36.

■ Our review of this record fully supports the District Judge's conclusion. We certainly cannot declare any of his findings to be "clearly erroneous." Indeed, we do not find in appellants' briefs or oral arguments before our court any serious efforts to dispute the District Judge's findings of fact concerning pre-1954 segregation. While the Columbus school system's dual black-white character was not mandated by state law as of 1954, the record certainly shows intentional segregation by the Columbus Board. As of 1954 the Columbus

School Board had "carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers and facilities within the school system." *Keyes v. School District No. 1, supra* 413 U.S. at 201–02, 93 S.Ct. at 2694. This is the legal predicate for the District Judge's finding of a dual school system.

Under these circumstances, the Columbus Board of Education has been under a constitutional duty to desegregate its schools for 24 years. *Brown v. Board of Educ. of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) [*Brown I*]; *Green v. County School Bd. of New Kent Co.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Keyes v. School Dist. No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Davis v. School Dist. of City of Pontiac, Inc.*, 443 F.2d 573 (6th Cir.), *cert. denied*, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); *NAACP v. Lansing Bd. of Educ.*, 559 F.2d 1042 (6th Cir.), *cert. denied*, 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977).

## V THE COLUMBUS SCHOOLS AFTER 1954

(a) *Pupil Assignment.* In *Swann v. Charlotte-Mecklenburg Bd. of Educ., supra*, Chief Justice Burger, for a unanimous Court, spelled out the factors which identify a school as a "white school" or as a "Negro school." The two most important of these involve racial discrimination in the assignment of pupils and in the assignment of faculty. *Id.*, 402 U.S. at 18, 91 S.Ct. 1267. In the same opinion, the Chief Justice approved the District Court's use of the 29–71% ratio of black to white children there involved as a "starting point" in determining both constitutional violation and remedy. *Id.* at 25, 91 S.Ct. at 1280:

"Awareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations. In sum, the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court."

In the present case, the District Judge made similar use of black-white ratios in determining both "racially identifiable" schools and "one race" schools and in "shaping a remedy." His definition of terms is important to the understanding of his findings:

"The concept of racial identifiability or unidentifiability is used to describe the relationship between the racial composition of a particular school and the racial composition of the system as a whole. A measure of statistical variance is applied to the actual (or estimated) system-wide percentage of black pupils. Schools which have a percentage of black pupils within this range are racially unidentifiable, or balanced. Schools which have a black population in excess of this range are racially identifiable, or imbalanced, black schools. Schools having a black population less than the range are racially identifiable, or imbalanced, white schools. The Court has accepted the figures used by Dr. Gordon Foster concerning the Columbus Public Schools:

| Year | Percentage Black Pupils in System | Statistical Variation | Range |
|---|---|---|---|
| 1950-57 | 15 % (estimate) | + 5% | 10 % - 20 % |
| 1957 | 20 % (estimate) | + 10% | 10 % - 30 % |
| 1964 primary | 25 % (estimate) | + 15% | 10 % - 40 % |
| 1964 secondary | 26.6% | + 15% | 11.6% - 41.6% |
| 1975 | 32.5% | + 15% | 17.5% - 47.5% |

• • •

"*Black School*—A school having a black student enrollment in excess of the applicable range of variance from the system-wide percentage of black pupils— that is, a racially identifiable black school. See 'racially identifiable.'

"*White School*—A school having a black student enrollment which is less than the applicable variance from the system-wide percentage of black pupils— that is, a racially identifiable white school.

"*One Race School*—A school in which 90% or more of the students are of a single race."

429 F.Supp. at 268–69.

■ We consider the ratios used by the District Judge to have been properly employed under the standards of *Swann v. Charlotte-Mecklenburg Board of Education, supra.*

In relation to pupil assignment, we have already noted that the District Judge found concerning the 1975–76 school year that over 70% of the students in the Columbus school system attended schools which were over 80% white or over 80% black.

As shown below, in the 1975–76 school year in Columbus, 85% of the elementary schools, 65% of the junior high schools, 67% of the senior high schools, 60% of the special schools, and 100% of the junior-senior high schools were racially identifiable as defined above.

*Analysis of Student Population Figures for 1975-76*[6]

| | | Racially Identifiable Schools | |
| --- | --- | --- | --- |
| | | Black | White |
| Elementary | (123 total) | 35 | 69 |
| Junior High | ( 26 total) | 7 | 10 |
| Senior High | ( 15 total) | 4 | 6 |
| Junior-Senior | ( 3 total) | 2 | 1 |
| Special | ( 5 total) | 1 | 2 |

| | | 80% Black | 80% White |
| --- | --- | --- | --- |
| Elementary | (123 total) | 25 | 71 |
| Junior High | ( 26 total) | 4 | 12 |
| Senior High | ( 15 total) | 2 | 7 |
| Junior-Senior | ( 3 total) | 0 | 1 |
| Special | ( 5 total) | 1 | 2 |

| | | 90% Black | 90% White |
| --- | --- | --- | --- |
| Elementary | (123 total) | 16 | 55 |
| Junior High | ( 26 total) | 4 | 6 |
| Senior High | ( 15 total) | 1 | 3 |
| Junior-Senior | ( 3 total) | 0 | 0 |
| Special | ( 5 total) | 1 | 0 |

| | | 96% Black | 96% White |
| --- | --- | --- | --- |
| Elementary | (123 total) | 10 | 34 |
| Junior High | ( 26 total) | 2 | 2 |
| Senior High | ( 15 total) | 1 | 1 |
| Junior-Senior | ( 3 total) | 0 | 0 |
| Special | ( 5 total) | 1 | 0 |

The following schools are in the 96% black group:

| *Elementary* | *Junior High* |
| --- | --- |
| Beatty Park | Champion |
| Eastgate | Monroe |
| Fair | |
| Garfield | *Senior High* |
| Gladstone | East |
| Hamilton | |
| Lexington | *Special Schools* |
| Shepard | Bethune Center |
| Trevitt | |
| Windsor | |

The following schools are in the 96% white group:

| *Elementary* | Oakland Park |
| --- | --- |
| Alpine | Olde Orchard |
| Avondale | Salem |
| Binns | Scioto Trail |
| Cedarwood | Sharon |
| Clinton | Siebert |
| Dana | Southwood |
| Devonshire | Stockbridge |
| Forest Park | Valley Forge |
| Fornof | Valleyview |
| Georgian Heights | Walford |
| Gettysburg | West Broad |
| Glenmont | Winterset |
| Hubbard | |
| Huy | |
| Indian Springs | *Junior High* |
| Kenwood | Buckeye |
| Liberty | Woodward Park |
| Lindberg | |
| Maize | *Senior High* |
| Maybury | Whetstone |
| Northridge | |

■ We recognize, of course, that racial separation based upon facts and circumstances beyond the control of school boards may constitute de facto segregation without necessarily representing violation of the Fourteenth Amendment. However, we have previously pointed out that the District Judge on review of pre-1954 history found that the Columbus schools were de jure segregated in 1954 and, hence, the Board had a continuing constitutional duty to desegregate the Columbus schools. The pupil assignment figures for 1975–76 demonstrate the District Judge's conclusion that this burden has not been carried. On this basis alone (if there were no other proofs), we believe we would be required to affirm the District Judge's finding of present unconstitutional segregation.

Of course, this Northern school case is distinguished from the classic Southern

6. These charts were prepared from information contained in Plaintiffs' Exhibit No. 11, which is included in the Appendix at I–1. Exhibit No. 11 has not been disputed by Appellants and has been cited in their brief, albeit for other purposes.

school cases in two important respects: first, Ohio did not, after 1887, require dual school systems by state law; and second, some black students did go to school in Columbus in 1954 in largely white schools. Since, however, a substantial portion of black students, as shown by the District Judge's findings and as supported by the record, were intentionally segregated in 1954, we do not believe these two distinctions serve to invalidate the District Judge's findings of a de jure dual school system. *See United States v. Board of Commissioners of Indianapolis*, 474 F.2d 81, 82–85 (7th Cir.), *cert. denied*, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973).

In *Keyes, supra*, the Court said:

"Indeed, to say that a system has a 'history of segregation' is merely to say that a pattern of intentional segregation has been established in the past. Thus, be it a statutory dual system or an allegedly unitary system where a meaningful portion of the system is found to be intentionally segregated, the existence of subsequent or other segregated schooling within the same system justifies a rule imposing on the school authorities the burden of proving that this segregated schooling is not also the result of intentionally segregative acts.

"In discharging that burden, it is not enough, of course, that the school authorities rely upon some allegedly logical, racially neutral explanation for their actions. *Their burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions.*"

*Id.* 413 U.S. at 210, 93 S.Ct. at 2698 (emphasis added).

Clearly "a meaningful portion of the [Columbus] system [was] found to be intentionally segregated" by the District Judge. Clearly also the Columbus Board has not carried the "burden" *italicized* in the quotation above.

"*The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.*"

*Village of Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977) (emphasis added).

*(b) Segregation in School Year 1975–76.*

We now turn to an analysis of the District Judge's findings of unconstitutional segregation as of school year 1975–76.

Our basic problem is to determine whether the segregation in Columbus schools in the school year 1975–76 clearly shown in the section immediately above was intentionally and, hence, unconstitutionally created or whether, as claimed by the Columbus Board of Education, it resulted from neighborhood housing segregation which the Columbus Board of Education could not control, and the racially "neutral" Columbus Board policy of neighborhood schools. In this regard, after noting the substantial evidence of segregation in pupil, teacher and administrator assignments, we look next at the Columbus Board's school site choices and its construction program.

*(c) School Construction.* In our consideration of the District Judge's findings of fact and conclusions of law concerning the Columbus Board's school construction programs between 1954 and 1975, we have in mind Chief Justice Burger's description of the importance of school construction and closings in school desegregation cases:

"The construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. They must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential develop-

ment of a metropolitan area and have important impact on composition of inner-city neighborhoods.

"In the past, choices in this respect have been used as a potent weapon for creating or maintaining a state-segregated school system. In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since *Brown*, closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of 'neighborhood zoning.' Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well promote segregated residential patterns which, when combined with 'neighborhood zoning,' further lock the school system into the mold of separation of the races. Upon a proper showing a district court may consider this in fashioning a remedy.

"In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is thus a factor of great weight." *Swann v. Charlotte-Mecklenburg Bd. of Educ., supra,* 402 U.S. at 20–21, 91 S.Ct. at 278.

In the years intervening between 1954 and the filing of the first complaint in this case in 1975, the parties agree that Columbus as a city grew enormously in boundaries (from 40 to over 173 square miles), and in public school population from 46,352 to 95,998. The result, of course, was a great amount of school construction. This factor offered consequent opportunities for the school board to make inroads upon the segregation (whether de facto or de jure) of black children and white children found by the District Judge to have existed in 1954.

The District Judge's analysis of the history of Columbus school construction has such relevance to the question of whether the 1975–76 school segregation was intentionally created that we quote it extensively:

"The Columbus defendants have contended throughout that they have followed a neutral neighborhood school policy. In keeping with that policy, schools have generally been built in locations where the expanding and growing population demanded additional facilities. Of 103 schools constructed between 1950 and 1975, 87 opened with a racially identifiable student body according to the calculations of Dr. Foster. Of the 87 schools, three have been closed. These schools closed with racially identifiable student populations. Seventy-one of the 87 new schools remained racially identifiable at the time of trial.

"It is necessary for the Court to consider those foreseeable effects of the construction practice which promote or preserve a segregated school system. It is apparent to the Court, and presumably to the defendants, that schools which open with a racially identifiable student body tend to stay that way. The Court finds that in some instances initial site selection and boundary changes present integrative opportunities.

"The evidence supports a finding that the Columbus defendants could have reasonably foreseen the probable racial composition of schools to be constructed on a given site. In some instances the Columbus defendants had actual knowledge of the likelihood that some schools would open and remain racially identifiable if built on the proposed sites. One such case was Gladstone Elementary School. See map 1 in the appendix to this opinion. Although Gladstone was apparently opened in 1965, the first statistics available concerning its racial composition concern the year 1966, when it had a student population which was 78% black. Gladstone's black enrollment has been in excess of 90% since 1967. Mr. Lumpkin, who later became the president of the Gladstone Parent Teacher Association, testified that prior to its construction he communicated to the Board of Education that Gladstone would predictably open as a predominantly black school. The 1960 census map

shows that in that year the area in which Gladstone was eventually built was predominantly white. The 1970 census map indicates that this same area was predominantly black. This reflects the definite trend of an expanding black population northward into this area in the 1960's. This trend was fairly well advanced in 1966, given Gladstone Elementary's 78% black enrollment that year.

"Gladstone was built between Hamilton Elementary and Duxberry Park Elementary with the greater portion of the Gladstone attendance zone being drawn from the southwestern portion of the former Duxberry zone. This section of Duxberry had a higher black density than did the northern and eastern sections. Thus, the black student population in Duxberry dropped from 40% in 1965 to 33% in 1966. Linden Elementary, to the north of Hudson Street, remained virtually 100% white throughout the middle 1960's. The construction of Gladstone south of Hamilton and Duxberry served to contain the black student population in the area south of Hudson Street.

"The need for greater school capacity in the general Duxberry area would have been logically accommodated by the construction of Gladstone north of its present location, nearer to Hudson Street. This would, of course, require some redrawing of boundary lines in order to accommodate the need for class space in Hamilton and Duxberry. If, however, the boundary lines had been drawn on a north-south pattern rather than an east-west pattern, as some suggested, the result would have been an integrative effect on Hamilton, Duxberry and the newly-constructed school.

"The Court also finds that the site selection and attendance zone boundaries for Sixth Avenue Elementary resulted in a foreseeably blacker school. Sixth Avenue opened as a primary center (grades K–3) in 1961 and closed in 1973. During this entire period, Sixth Avenue was racially identifiable with a black student population of at least 85%.

"The Sixth Avenue school was built in accordance with a recommendation contained in the 1958–59 study of the Public School Building Needs of Columbus, Ohio. Recommendation number 11 on page 58 of that document describes an area bounded by High Street on the west, Chittenden Avenue on the north, New York Central Railroad on the east, and Fifth Avenue on the south. Sixth Avenue elementary was built on the proposed site. The attendance zone for Sixth Avenue was as recommended, except that Fourth Street was its western boundary. This area can generally be described as the eastern portion of the Weinland Park Elementary attendance zone and the northeastern corner of the Second Avenue Elementary attendance zone. Both the 1960 and 1970 census maps (and the underlying statistical data) show that these portions of the former Weinland Park and Second Avenue Elementary attendance zones had the highest percentage of black residents within the area. The census data shows that the population west of Fourth Street was largely 0 to 27.9% black with two or three blocks being in the 28 to 49.9% range. The east side of Fourth Street is generally in the 50 to 89.9% black range, with several blocks in the 90 to 100% black category. The Sixth Avenue attendance zone consists almost entirely of 50 to 100% black population. The black population in the area left within the attendance zones of Weinland and Second after Sixth opened is generally below 27.9%, with a few blocks in the 28% to 49.9% range.

"In 1964, three years after Sixth Avenue opened and the first year for which racial statistics are available, Sixth Avenue had a black student enrollment of 91%. In that year Weinland Park and Second Avenue had black student populations of 30% and 28%, respectively. The boundary lines for these schools remained relatively unchanged until 1973, when Sixth Avenue closed. Sixth Avenue closed with a black enrollment of 94.6%. In that year Weinland Park and Second had black enrollments of 30.5% and 16.7%, respectively. In the 1974–75 school year following the closing of Sixth Avenue, the boundary lines for Weinland and Second were redrawn to re-

semble the 1960 attendance zones. With the closing of Sixth the black population of Weinland rose from 30.5% to 46.7% while Second Avenue rose from 16.7% to 20.7%. The Court finds that the construction site and attendance zone drawn for Sixth Avenue Elementary between 1961 and 1973 resulted in Sixth Avenue being the black school in the area while making Weinland Park and Second Avenue whiter.

"The impact of building a new elementary school at the Sixth Avenue location and drawing the attendance zone boundaries where they were drawn was clearly foreseeable to the Columbus defendants. Some students living in the area east of Fourth Avenue, shown to be predominantly black on both the 1960 and 1970 census maps, were compelled to walk to Sixth even though Weinland Park was closer to their homes. Even if the Court were to find compelling non-segregative reasons for the construction of this new school on its Sixth Avenue site, it is readily obvious from the census maps that the objectives of racial integration would have been better served, without abandoning the neighborhood school policy, by drawing the attendance zones east and west between High Street and the railroad tracks, rather than north and south along Fourth Street. The Columbus defendants have offered no explanation for the fashion in which Sixth Avenue was opened and maintained during this period.

"The Court is well aware of the Board's obligation to provide class space as the need arises, whether it be in an area of expanding geographic growth, or within the inner-city area due to increasing population or the closing of obsolete structures. Given segregated residential patterns, not all schools can be built in an integrated setting. In such circumstances the selection of sites for new schools alone may not serve as a tool for integration. The intervening plaintiffs argue that the construction of a school in an area known to have been covered by racially restrictive covenants and subject to discriminatory real estate practices constitutes an impermissible participation by the school officials in racial discrimination.

The Court does not infer segregative intent from the mere construction of schools in an area needing the facilities even though that area had been covered by racial covenants. Without the use of pairings, transportation, or other techniques, the racial imbalance in these schools could not have been cured by the siting of schools even had the Columbus defendants devoted their attention to the racial integration of the schools."

429 F.Supp. at 241–43.

■ The record of this trial supports these findings of fact by the District Judge. They certainly cannot be said to be clearly erroneous. We also agree with the District Judge's analysis of the evidence, adding only two comments. First, the summary of the gross statistics as found by the District Judge shows that of 103 schools constructed between 1950 and 1975, 87 opened racially identifiable and that as of the time of trial, 71 of the 87 remained racially identifiable. In our view, this requires a very strong inference of intentional segregation. Second, this record actually requires no reliance upon inference, since, as indicated above, it contains repeated instances where the Columbus Board was warned of the segregative effect of proposed site choices, and was urged to consider alternatives which could have had an integrative effect. In these instances the Columbus Board chose the segregative sites. In this situation the District Judge was justified in relying in part on the history of the Columbus Board's site choices and construction program in finding deliberate and unconstitutional systemwide segregation.

(d) During most of the history of the Columbus schools, the same patterns of segregation which we have just described in relation to pupil assignments to schools by race prevailed also in relation to teacher and administrator assignments.

All black teachers in the system were assigned to five schools recognized as black in 1954. When Champion was built, it opened with an all black faculty. When it was decided to make Champion a junior high school and send its overwhelmingly

black elementary student body to Pilgrim, all of the white faculty at Pilgrim was transferred out and replaced with an all black faculty. Similarly obvious segregation of black teachers occurred as found by the District Judge in at least three other schools prior to 1954.

The District Judge, however, also found similar teacher assignments by race into the 1970's:

"Between 1964 and 1973 the Columbus defendants generally maintained their prior practice of assigning black teachers to those schools with substantial black student populations. As an example, as late as the 1972–73 school year, there were 250 black elementary teachers assigned to schools in which the student body was 80–100% black, which represented 63.3% of all of the black elementary teachers in the system. In the same school year, 34 elementary schools, all of which contained 80–100% white student bodies, had no black teachers assigned to them."

429 F.Supp. at 238.

Yet the District Judge entered no orders to desegregate the faculty or staff. The record clearly shows both when and why the Columbus Board ceased to assign teachers by race. As to teachers in the 1975–76 school years, the District Judge found:

"The number of black teachers in each school almost compares to the ratio of black to white teachers in the total system. Suffice it to say that this has occurred only after the Ohio Civil Rights Commission's complaint and the consummation of a consent order before that Commission. Moreover the Court cannot find, as plaintiffs urge, that the Columbus defendants have failed to comply with the consent order . . . ."[7]

*Id.* at 259–60.

Obviously it was no "neutral" neighborhood school concept which occasioned generations of black teachers to be assigned almost exclusively to black schools until the Ohio Civil Rights Commission complaint was settled in July of 1974.

(e) *Gerrymandering, Pupil Options, Discontiguous Pupil Assignment Areas, Etc.* This record also shows instances of intentional employment of devices which allowed white students to avoid attendance at a primarily black school, or which required black students to attend a primarily black school in place of a closer white school. These instances can properly be classified as isolated in the sense that they do not form any systemwide pattern. They are significant, however, in indicating that the Columbus Board's "neighborhood school concept" was not applied when application of the neighborhood concept would tend to promote integration rather than segregation.

■ As to these instances, the District Judge made some specific findings (which the Columbus Board barely disputes) which we cannot hold to be "clearly erroneous":

"The opportunity for active integration did exist, however, without the use of transportation, in some parts of the city. Even greater integration could have been achieved with the use of pairings and limited transportation. This opportunity existed, and continues to exist in those areas of the city where the population shifts from one race to another. An examination of the census maps for the years 1950, 1960 and 1970 discloses a general pattern of high density (50 to 100%) black population in the center of the city fringed by areas of lesser, but still substantial, (10 to 50%) black population. The remainder of the city is predominantly white, although there are pockets of white population within the central city area, and pockets of black population in the outlying areas.

"The Columbus defendants argue that housing in the City of Columbus is segregated as a result of private discrimination and other factors affecting residential development over which the school board has no control and little influence. The Columbus defendants maintain that they have adopted a racially neutral neighborhood school policy. They contend that the use of

---

**7.** Apparently this order and compliance therewith also apply to administrators.

a neighborhood school policy in a city with segregated housing patterns results, through no fault of the school authorities, in racially imbalanced schools. Under the neighborhood school policy, the site selected for a new school limits the attendance zone boundaries that can be drawn for that school. The evidence shows that in some instances the need for school facilities could have been met in a manner having an integrative rather than a segregative effect.

### The Near-Bexley Option

"East of the downtown area of Columbus and entirely surrounded by the Columbus city limits, lies the City of Bexley, Ohio. East of Bexley, and also entirely surrounded by the Columbus city limits, is the City of Whitehall, Ohio. With the exception of one small area of Columbus which jumps across Alum Creek to the eastern side of the creek, the western boundary of Bexley follows the course of Alum Creek. The Columbus residential area to the west of Alum Creek was in 1960 and 1970, according to census data, heavily populated by blacks. For that area in those years, census tracts generally appear as either 50–89% black or 90–100% black. A different picture existed for the area to the east of Alum Creek, encompassing the City of Bexley and the small portion of Columbus which lies immediately east of the creek. According to census data, 99% of Bexley residents were white in 1960, and 99.3% were white in 1970. Census data further indicate that in 1960 there were 159 people residing in that area of Columbus which lies immediately east of Alum Creek; all of these people were white.

"From the 1959–60 school year through the 1974–75 school year, the Columbus Board of Education established and maintained an optional attendance zone encompassing the area of Columbus which lies directly east of Alum Creek. Students living in that area were within the attendance areas of schools located to the west of Alum Creek, nearer the Columbus downtown area. This 1959–1975 option permitted these students to elect to attend Columbus

city schools located to the east of the City of Bexley. For ease of reference, the Court will refer to this option as the 'Near-Bexley Option.'

"Absent the Near-Bexley Option, students living in the optional zone area would have been required to attend Fair Avenue Elementary (opened in 1890), Franklin Junior High School (opened in 1898) and East Senior High School (opened in 1922). The following statistics are applicable to these near-east side schools:

| | 1964 | 1969 | 1974 |
|---|---|---|---|
| **Fair Avenue Elem.** | | | |
| % black students | 92.0 | 95.0 | 96.7 |
| % black faculty | 83.3 | 37.1 | 23.3 |
| **Franklin Jr. H.S.** | | | |
| % black students | 85.8 | 96.3 | 93.7 |
| % black faculty | 32.6 | 34.6 | 45.8 |
| **East Sr. H.S.** | | | |
| % black students | 94.9 | 98.9 | 98.9 |
| % black faculty | 12.7 | 28.9 | 31.3 |

The schools on the receiving end of the option were Fairmoor Elementary (opened in 1950), Eastmoor Junior High School (opened in 1962) and Johnson Park Junior High School (opened in 1958), and Eastmoor Senior High School (opened in 1955). The following statistics are applicable to these schools:

| | 1964 | 1969 | 1974 |
|---|---|---|---|
| **Fairmoor Elem.** | | | |
| % black students | 0.1 | 0.9 | 4.6 |
| % black faculty | 0 | 4.0 | 18.2 |
| **Eastmoor Jr. H.S.** | | | |
| % black students | 30.5 | 34.4 | 45.3 |
| % black faculty | 0 | 9.8 | 15.2 |
| **Johnson Park Jr. H.S.** | | | |
| % black students | 0.3 | 2.9 | 26.7 |
| % black faculty | 0 | 2.0 | 12.7 |
| **Eastmoor Sr. H.S.** | | | |
| % black students | 10.6 | 17.8 | 34.9 |
| % black faculty | 0 | 4.0 | 15.2 |

Eastmoor Junior High School was a receiving school for the Near-Bexley Option during the 1959–60, 1960–61, and 1963–64 through 1974–75 school years. Johnson Park was a receiving school for the option during only the 1961–62 and 1962–63 school years; there are no racial statistics available for Johnson Park Junior High School

for these two years. The 1960 census data indicate that the Johnson Park attendance area was predominantly white at that time.

"The Near-Bexley Option, then, concerned a small, white enclave on Columbus' predominantly black near-east side. The option area, although part of Columbus, had more in common, geographically and racially, with Bexley than with Columbus. In practical effect, the Near-Bexley Option permitted white students in the optional zone to escape attendance at black Fair Avenue Elementary, Franklin Junior and East Senior High Schools, and permitted them instead to attend white (or whiter) Fairmoor Elementary, Eastmoor Junior or Johnson Park Junior, and Eastmoor Senior High Schools. And, as an examination of maps 2, 3, and 4 in the appendix demonstrates, to exercise the option Columbus students had to traverse the City of Bexley to arrive at the option schools.

"Nothing presented by the Columbus defendants at trial, at closing arguments, or in their briefs convinces the Court that the Near-Bexley Option was created or maintained for racially neutral reasons. The Court finds that the option was not created and maintained because of overcrowding or geographical barriers.

"These defendants contend that the option involved only a few students. The July 10, 1972, minutes of the State Board of Education, at page 44, appear to indicate that in 1972, there were 25 public elementary school students and two public high school students residing in the optional zone. However, the fact that the option was created, and maintained by the Columbus Board of Education for some 16 school years, is of itself some evidence that the option was not merely a paper exercise.

"The Court is not so concerned with the numbers of students who exercised or could have exercised this option, as it is with the light that the creation and maintenance of the option sheds upon the intent of the Columbus Board of Education. It is noteworthy that the July 10, 1972, minutes of the State Board of Education indicate awareness by the State Board that a proposed transfer of the Near-Bexley Option area to the Bexley school district '[r]aises the question of percentage of racial mix.' (The proposed transfer was opposed by the Columbus Board of Education, and was denied by the State Board.) Quite frankly, the Near-Bexley Option appears to this Court to be a classic example of a segregative device designed to permit white students to escape attendance at predominantly black schools.

### Highland, West Mound and West Broad Elementary Optional Zones and Boundary Changes

"Another area illustrative of action by the Board promoting racially segregated schools is on the west side of Columbus. Four elementary schools are involved: Burroughs, Highland, West Broad and West Mound. The census data for the years 1950, 1960 and 1970 show an area of black population between West Broad Street and Sullivant Avenue bounded on the west by Eureka Avenue and on the east by the Columbus State Institute. This area is referred to locally as the Hilltop. The western portion of this area fell mostly in the 50% to 100% black range. The eastern portion, between Belvidere and the Columbus State Institute, was in the 0 to 9.9% black range in 1950 and has become increasingly blacker in later years. The 1970 census data shows this area to have several blocks in each of the ranges of 10 to 27.9%, 28 to 59.9% and 60 to 89.9% black.

"Highland Elementary has served the majority of this area between 1950 and the present. During this period the Columbus defendants established two optional attendance zones within the Highland boundaries, and also changed the attendance zone boundaries of Highland. Although the opportunity existed for the integration of the four elementary schools in this area, the option zones and boundary changes tended to preserve and promote the racial imbalance of these schools.

"One optional zone appeared in 1955 and continued through the 1956–57 school year. See map 5 in the appendix. In those years,

and since 1939, the Highland attendance zone included an area north of West Broad Street to the Pennsylvania Railroad tracks bounded on the west by Eldon Avenue and on the east by the Columbus State Hospital. This portion of Highland north of Broad Street was composed in each of the census years, 1950, 1960 and 1970 of blocks in the 0 to 9.9% black range, as was the entire West Broad attendance zone. For the school years 1955–56 and 1956–57 that portion of Highland north of Broad was made into an optional attendance area with students having the option of attending the predominantly white West Broad or the predominantly black Highland.

"Highland was 63 students over capacity in 1955, and 67 students over capacity in 1956. West Broad, however, was also over capacity in 1955 and 1956 by 115 and 113 students, respectively. An examination of the attendance zones in the West Broad Street area reveals that several required students to cross this street to reach their school. The Court concludes that the Highland-West Broad optional zone was not created to alleviate overcrowding or because of a geographic barrier. This optional zone allowed the white students north of Broad Street to escape Highland and go to West Broad. The result was to contain blacks within Highland and to maintain West Broad as a predominantly white school.

"In 1957 the boundary lines for Highland and West Broad were redrawn, eliminating the option zone and placing that area permanently within the West Broad attendance zone. Because West Broad's capacity problems were greater than those of Highland, a purpose of the boundary change could not have been to alleviate the overcrowding at Highland. Since the West Broad attendance zone dipped south of Broad Street west of the Highland zone, the Court concludes that West Broad Street was not considered a geographical barrier in the decision to redraw these boundaries.

"In 1964, the first year in which the racial statistics for enrollment are available, Highland had a black student enrollment of 75%. West Broad Street was 100% white in 1964. The Court finds that the optional attendance zone and boundary changes between Highland and West Broad had a foreseeable and actual effect of promoting racial imbalance.

"Another optional attendance zone was created within the Highland boundaries in 1955. This optional zone was in the southeastern corner of Highland and gave the students living there the option of attending either Highland or West Mound Street. See map 5 in the appendix. This option continued through the 1960–61 school year. The census data for 1950 shows that the West Mound Street attendance zone was, with the exception of one block, within the range of 0 to 9.9% black. The remaining block was in the 10 to 27.9% black category. In 1960 the West Mound attendance area was still largely in the 0 to 9.9% black range with four blocks in the 10 to 27.9% category and one block in the 28 to 49.9% range. The option area east of Wrexham and south of Doren was in the 0 to 9.9% black range in the 1950 census. In the 1960 census the option area continued to be predominantly white with a small portion falling in the 10 to 27.9% black range.

"The effect of the Highland-West Mount option was to allow those students living in the whiter portion of the Highland attendance zone to opt out of attendance at identifiably black Highland in favor of the whiter West Mound Street School. The defendants contend that this optional zone was created to alleviate overcrowding in Highland. During the option years Highland was over capacity and West Mound Street was under capacity ranging from four students below capacity in 1957 to 105 in 1960. The effect of the option on the overcrowding at Highland was the foreseeable result that the white students within the option zone would exercise the option to attend West Mound. Thus, even though an option zone may have eased the capacity problem, this particular option zone tended to make Highland blacker and West Mound whiter. In 1961 the option was terminated and the greater part of the option area was rezoned permanently to West Mound Street.

"The intervening plaintiffs have shown that feasible alternatives were available and known to the Columbus defendants. One of these alternatives was to move the option area to the west, or make the boundary changes west of where they were made. This alternative would have allowed students from the blacker part of the Highland attendance area to attend West Mound, thus having an integrative effect on West Mound while easing the overcrowding at Highland. Another alternative would require redrawing the attendance zones in this area for Highland, West Mound, West Broad, and Burroughs. Dr. Foster testified that the total capacity of these four schools was 3,060 at the time of trial and the enrollment was 2,773. The following statistics are applicable to these schools:

| Burroughs | 1964 | 1969 | 1974 |
|---|---|---|---|
| % black students | 16 | 14.6 | 12.5 |
| % black faculty | 0 | 3.1 | 18.5 |
| **Highland** | | | |
| % black students | 75 | 71.7 | 72.7 |
| % black faculty | 4.6 | 22.6 | 16.7 |
| **West Mound** | | | |
| % black students | 15 | 16.1 | 16.5 |
| % black faculty | 0 | 7.7 | 17.4 |
| **West Broad** | | | |
| % black students | 0 | 0.7 | 1.0 |
| % black faculty | 0 | 3.0 | 12.1 |

"The racial balance at all four schools could have been enhanced by redrawing the attendance zones for these four schools through the Hilltop area. This could also be achieved by pairing. The Court finds each of these alternatives to be feasible and there has been no showing that they are unsound as a matter of academic administration. The Court concludes that the actions of the Columbus defendants had a substantial and continuing segregative impact upon these four west side schools.

### Moler Elementary Discontiguous Attendance Area

"In the early and mid-1960's, the Columbus Board of Education was faced with overcrowded elementary schools in the southeastern area of the Columbus school district. Stockbridge Elementary, Alum Crest Elementary, Watkins Elementary and an addition to Stockbridge Elementary were opened in the southeastern area during this period. In the 1963–64 school year, the Board of Education assigned the eastern portion of the Watkins Elementary School attendance area to Moler Elementary School. This eastern portion of the Watkins area did not abut the Moler attendance area. See map 6 in the appendix. To arrive at Moler, students living in the discontiguous attendance area were transported through the Alum Crest attendance area. This discontiguous attendance area remained in effect through the 1975–76 school year, when this case was tried.

"Census data for 1960 indicate that neither the Moler attendance area proper nor its discontiguous attendance area had a significant number of black residents. The same census showed that the Alum Crest attendance area did have a significant black population. The following statistics are applicable:

| | 1964 | 1969 | 1974 |
|---|---|---|---|
| **Alum Crest Elem.** | | | |
| % black students | 50 | 77 | 78.7 |
| % black faculty | 33.3 | 40 | 25 |
| **Moler Elem.** | | | |
| % black students | 0.2 | 8.7 | 50.1 |
| % black faculty | 0 | 10.5 | 11.8 |

Between September, 1966 and June, 1968, about 70 students, most of them white, were bused daily past Alum Crest Elementary from the discontiguous attendance area to Moler Elementary. The then-principal of Alum Crest watched the bus drive past the Alum Crest building on its way to and from Moler. At the time, the Columbus Board of Education was leasing 11 classrooms at Alum Crest to Franklin County. There was enough classroom space at Alum Crest to accommodate the students who were transported to Moler. When the principal inquired of a Columbus school administrator why this situation existed, he was given no reasonable explanation.

"The Court can discern no other explanation than a racial one for the existence of the Moler discontiguous attendance area for the period 1963 through 1969.

### The Heimandale Discontiguous Attendance Area

"The Fornof Elementary attendance area is in the southern part of the Columbus school district. To the east of the Fornof area, and adjacent to it, is the Heimandale Elementary attendance area. The 1950 census shows no appreciable black population in either attendance area. The 1960 census indicates that Fornof's area remained predominantly white, with all census tracts having less than 10% black residents. The Heimandale attendance area, on the other hand, reflects a substantial black population by 1960, with most of the area between 28% and 50% black, and some tracts as high as 90–100% black. The 1970 census data for both areas are similar to the 1960 data. In 1964, the first year for which such statistics are available, Fornof had 0.2% black students, and no black faculty members. In the same year, Heimandale had 40% black students and 40% black faculty.

"For six school years, from 1957–58 through 1962–63, the Columbus Board of Education perpetuated a discontiguous attendance area involving Heimandale and Fornof. Students living on three streets (Wilson, Bellview and Eagle Avenues) located near the center of the Heimandale attendance area were assigned to attend Fornof instead of Heimandale. Less than 10% of the persons living on these streets were black. There was no geographical or capacity justification for the Heimandale discontiguous attendance area. The existence of this area meant that students living on Wilson, Bellview or Eagle Avenue did not attend their neighborhood school, Heimandale, which had a significant number of black students, and did attend Fornof, which was a racially identifiable white school.

### The Innis-Cassady Alternatives

"In 1971, the Columbus school district absorbed the Mifflin school district. The area involved is north of the City of Bexley, between 13th Avenue and Morse Road. The Mifflin school district had been in poor financial straights; schools in the district were severely overcrowded. The Columbus Board of Education initially maintained the Mifflin district boundary as a school attendance area, but was required to assign some pupils to a nearby temporary facility while more permanent arrangements were being made.

"The north-south length of the area involved is greater than the east-west breadth. Cassady Elementary School, opened as a Mifflin school in 1964, is located on Agler Road roughly midway between 13th Avenue and Morse Road. The residential area south of Agler Road was and is predominantly black, while the area north of Agler Road was and is predominantly white. Because Cassady Elementary was so overcrowded, the first school built with funds raised under the 1972 bond issue was Innis Road Elementary School, which was intended to alleviate the overcrowding at Cassady. Innis was built to the north and west of Cassady; it opened in 1975.

"The Columbus Board of Education had announced in 1972 that improved racial balance of student enrollment was a factor which was relevant in site selection and boundary drawing. In 1975, prior to the September opening of Innis Road Elementary, the administrative staff of the Columbus Public Schools presented to the Columbus Board of Education two alternative attendance proposals concerning Innis and Cassady. Dr. John Ellis, Superintendent of the Columbus Public Schools, explained at trial why two options, rather than a single recommendation, were presented to the Board:

'The basic reason was to see, as we attempt to wrestle with the very difficult issue of how can we insure we are doing everything that we can that is reasonable and appropriate and right to increase the approved integration within the Columbus School District. We are honestly attempting to achieve that end, and we looked at a couple of different alternatives in these cases to see whether or not we could come up with a better plan than—to see if there was a better ap-

proach, and as it turned out, both approaches had some problem with the standpoint of distances and transportation and crossing highways and preferences of people and a host of factors that go into the establishment of boundaries.'

Dr. Ellis and Mr. Robert W. Carter, Executive Director of Administration, Columbus Public Schools, both testified at trial that in their respective opinions, the alternatives presented to the Board of Education concerning Innis and Cassady were both educationally sound. The administrative staff did not recommend one alternative over the other.

"One alternative entailed dividing the old Mifflin district into two attendance areas, with a horizontal boundary line dividing an Innis attendance area to the north from a Cassady attendance area to the south. The administrative staff and the Board of Education knew that adopting this alternative would mean that Cassady would draw its enrollment from the predominantly black southern portion of the old Mifflin district, while Innis would draw its enrollment from the predominantly white northern portion.

"The other alternative entailed maintaining the old Mifflin district as the attendance area for both Cassady and Innis, with one school designated as a primary center (kindergarten through third grade) and the other as an intermediate school (grades four through six). The administrative staff and the Columbus Board of Education knew that adopting this alternative would mean that the black student enrollment in each school would be roughly equivalent to the white student enrollment.

"The Columbus Board of Education chose the first alternative. It divided the old Mifflin district into two elementary attendance areas, one to the south for Cassady and one to the north for Innis. When Innis Road Elementary School opened for the 1975–76 school year, its student enrollment was 27.3% black. Cassady Elementary School during the same year had 89.3% black students.

"During closing arguments, counsel for the Columbus Board of Education explained the Board's decision as follows:

'The Board based its decision on the fact that it at the time decided to maintain the K-6 organization throughout the district and that the pairing of these schools, given the geographical location of these two areas, would have required a substantial amount of transportation to effect a pairing situation.'

The Columbus defendants' proposed findings of fact run in a similar vein:

'[T]he pairing of such schools would have required substantial transportation because of the large size of the combined areas. The Board voted not to pair the schools.'

'. . . The alternative proposal would have required substantial transportation because of the greater distances involved. The Columbus Board was also justified in its decision to maintain the K-6 organization that now exists throughout the system with the exception of Colerain, which is a primary and crippled children center. Other primary centers are no longer in existence. Sixth Avenue has been closed. The K-3 primary center at Hudson, which was assigned to Hamilton, was recently eliminated with an addition. The school system has never had a K-3 primary center without a K-6 home school . . . .'

"These defendants' own proposed findings amply demonstrate that when in the past a diversion from the K-6 structure served interests, such as overcrowding and special educational concerns, which were considered important by the Board, the Columbus Board of Education did not hesitate to abandon the K-6 structure in favor of primary centers and intermediate schools.

"The Court can find no evidence in this record supporting defendants' argument that pairing Innis and Cassady would have necessitated 'substantial transportation' of students. Dr. Ellis testified that *both* alternatives 'had some problem with the standpoint of distances and transportation and crossing highways . . . .' "

429 F.Supp. at 243–49.

[See following illustrations]

Gladstone, Duxberry Park, Linden,
Hamilton and Arlington Park
Elementary Schools

Map No. 1

Near-Bexley Option — Junior High Schools

Map No. 3

Near-Bexley Option — Elementary Schools

Map No. 2

Near-Bexley Option — Senior High Schools

Map No. 4

Highland, West Mound and West Broad
Elementary Optional Zones

Map No. 5

West Broad
Elementary
Attendance Area

Highland--
West Broad
Optional
Zone

West Broad
Street

Highland--
West Mound
Optional Zone

Highland
Elementary
Attendance
Area

West Mound
Elementary
Attendance Area

Moler Elementary Discontiguous
Attendance Area

Map No. 6

Moler
Elementary

Alum Crest
Elementary

Moler
Discontiguous
Attendance Area

429 F.Supp. at 270–75.

## VI SYSTEMWIDE SEGREGATION AND SYSTEMWIDE IMPACT

The law cited at the beginning of this opinion, as stated by the Supreme Court in *Swann, supra, Keyes, supra,* and *Dayton, supra,* calls for systemwide desegregation when (and only when) the segregative practices found had a systemwide impact. The key phrases are:

"As with any equity case, the nature of the violation determines the scope of the remedy."

*Swann, supra,* 402 U.S. at 16, 91 S.Ct. at 1276.

"[P]roof of state-imposed segregation in a substantial portion of the district will suffice to support a finding by the trial court of the existence of a dual system." *Keyes, supra,* 413 U.S. at 203, 93 S.Ct. at 2695.

"The duty of both the District Court and the Court of Appeals in a case such as this, where mandatory segregation by law of the races in the schools has long since ceased, is to first determine whether there was any action in the conduct of the business of the school board which was intended to, and did in fact, discriminate against minority pupils, teachers, or staff. *Washington v. Davis, supra.* All parties should be free to introduce such additional testimony and other evidence as the District Court may deem appropriate. If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton School population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy. *Keyes,* 413 U.S., at 213 [93 S.Ct. 2686]."

*Dayton, supra,* 433 U.S. at 420, 97 S.Ct. at 2775.

The three statements represent increasingly detailed concern that the equitable remedy should be fashioned to fit the actual Fourteenth Amendment violations which were found. The most deliberate and willful violation of the Constitution in one of over a hundred schools would therefore call for an order to take effective means to desegregate that school. The remedy might affect one or more nearby schools. The isolated single violation obviously would not call for a systemwide desegregation order.

It is clear to us that the phrases "incremental segregative effect" and "system-

wide impact" employed in the *Dayton* case require that the question of systemwide impact be determined by judging segregative intent and impact as to each isolated practice, or episode. Each such practice or episode inevitably adds its own "increment" to the totality of the impact of segregation. *Dayton* does not, however, require each of fifty segregative practices or episodes to be judged solely upon *its* separate impact on the system. The question posed concerns the impact of the total amount of segregation found—after each separate practice or episode has added its "increment" to the whole. It was not just the last wave which breached the dike and caused the flood.

In the *Dayton* school case, the Supreme Court held that where the District Judge had only identified "three separate although relatively isolated instances of unconstitutional action on the part of petitioners" [*id.* at 413, 97 S.Ct. at 2772] . . . "the District Court's findings of constitutional violations did not, under our cases, suffice to justify the remedy imposed." *Id.* at 414, 97 S.Ct. at 2772. The Supreme Court carefully noted that this court had observed in its opinion that the record contained more evidence concerning segregation than the District Judge had found, but that neither the District Court nor this court had entered specific findings of fact on such alleged additional segregative practices. The Supreme Court then ordered the case remanded for further consideration and, if justified, further evidentiary proceedings and further findings of fact by the District Court or the Circuit Court. The Supreme Court also left the systemwide desegregation order in effect.

We now turn to the consideration of the incremental segregative effect of the major constitutional violations found by the District Judge. School board policies of systemwide application necessarily have systemwide impact. 1) The pre-1954 policy of creating an enclave of five schools intentionally designed for black students and known as "black" schools, as found by the District Judge, clearly had a "substantial"—indeed, a systemwide—impact. 2) The post-1954 failure of the Columbus Board to desegregate the school system in spite of

many requests and demands to do so, of course, had systemwide impact. 3) So, too, did the Columbus Board's segregative school construction and siting policy as we have detailed it above. 4) So too did its student assignment policy which, as shown above, produced the large majority of racially identifiable schools as of the school year 1975–76. 5) The practice of assigning black teachers and administrators only or in large majority to black schools likewise represented a systemwide policy of segregation. This policy served until July 1974 to deprive black students of opportunities for contact with and learning from white teachers, and conversely to deprive white students of similar opportunities to meet, know and learn from black teachers. It also served as discriminatory, systemwide racial identification of schools.

 As noted earlier in this opinion, we rely upon the detailed findings of the District Judge in relation to each of the constitutional violations cited in the paragraph above. As to each of these violations, we believe this record requires a finding that each policy or practice cited had (and was intended to have) a systemwide application and impact. Each such policy or practice also added an increment to the sum total of the constitutional violation found. Beyond doubt the sum total of these violations made the Columbus school system a segregated school system in violation of the Fourteenth Amendment and thoroughly justified the District Judge in ordering a systemwide remedy. If the detailed findings in this paragraph tracking the language of the *Dayton* case cannot appropriately be implied from the District Judge's post-*Dayton* opinion (and we think they can and should be), we now enter these findings as the findings of this court, based upon the 6,600 pages of evidence in the record made before the District Court.

Appellants in this appeal seek a remand to the District Court on the basis of the Supreme Court's opinion in *Dayton, supra.* For reasons spelled out above, and the distinctions cited below, we reject this suggestion.

1) The Supreme Court in *Dayton*, on consideration of the District Court findings then entered, characterized the Dayton school system as one "where mandatory segregation [by law of the races] has long since ceased." The Columbus record, as found by the District Judge, presented a situation where a segregated school system existed in 1954, when *Brown I* was decided, and has been intentionally maintained as such by the Columbus School Board down to the date of trial of this case.

2) The Supreme Court in *Dayton* noted that the District Judge had found only three isolated constitutional violations. In our instant appeal, the District Judge found many more constitutional violations, with the major violations being ones which, as shown above, were systemwide in application and impact.

3) In the *Dayton* case a major reason for reversal was this court's reliance in requiring a systemwide remedy upon three violations which were not systemwide in character without making findings upon other violations contained in the record. In this case we rely specifically upon the systemwide constitutional violations found by the District Judge, and, to the degree arguably necessary, add findings of our own.

4) In the *Dayton* case, of course, neither the District Court nor this court had the opportunity to consider the standards furnished by the *Dayton* opinion. In this case the District Judge was asked to and did consider the *Dayton* standards and held that his prior opinion was in conformity therewith. We, of course, have likewise considered it in detail and agree that the systemwide violation found by the District Judge was in conformity with *Dayton* standards.[8]

## VII THE STATE BOARD OF EDUCATION LIABILITY

The District Judge, in addition to finding the Columbus Board of Education liable for the unconstitutional segregation of the Columbus school system, also found similar liability as to the Ohio State Board of Education. His findings on this score were, however, quite different ones:

*"State Board of Education and Superintendent of Public Instruction*

"The Ohio Constitution clearly places the responsibility for public education upon the State of Ohio. Because local school boards initiate school levies for local voters' consideration, expend funds locally, and generally exercise administrative control over local schools, many people may well believe that such local boards of education have primary responsibility for the maintenance and operation of the public schools in Ohio. In fact, the state remains primarily responsible. This mandate has been our law since the adoption of the 1851 Ohio Constitution.[5]

[5] Ohio Const. art. I, § 7; art. II, § 26; art. VI, § 2 (1851). Ohio Const. art. VI, § 3 (1912).

"The Sixth Circuit has commented on the obligation of the state administrative agency as follows:

'Since an Ohio Attorney General's opinion dated July 9, 1956, the State Department of Education has known that it has an affirmative duty under both Ohio and federal law to take all actions necessary, including, but not limited to, the withholding of state and federal funds, to prevent and eliminate racial segregation in the public schools.'

*Brinkman v. Gilligan*, 503 F.2d 684, 704 (6th Cir. 1974).

"At no time have these state defendants *actively* moved to do anything to correct the racial imbalance in the Columbus schools. Nor did they act to make a determination as to whether black children were being deprived of their rights. The State Board and Superintendent assure that such matters as teacher qualifications, school building standards, curriculum require-

---

**8.** We have considered but, for the reasons recited above, we do not agree with appellants' contention that a different result is mandated by the remand orders of the Supreme Court in

*School District of Omaha v. United States*, 433 U.S. 677, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977), and *Brennan v. Armstrong*, 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977).

ments and annexations are lawfully administered. See R.C. 3301.07. The Court is of the opinion that the law of Ohio requires that the State Board of Education act to assure that school children in the various local school districts enjoy the full range of constitutional rights. The Board has not done this in Columbus even though it has received sufficient statistical evidence of student and faculty racial imbalance and is well aware of the existence of racially imbalanced schools in Columbus.[6]

[6] Counsel for the State of Education argued as follows during closing arguments:

I am not pleading ignorance.

. . . . .

I am saying to the Court that the State Board has constructive knowledge of everything that is reported to the State Department of Education about the racial makeup of pupils and staff in the schools of Columbus. It has constructive knowledge. It is bound by that knowledge.

Now, it is not so much a matter of investigation, Your Honor. It is a question of whether or not, knowing that, the State Board and Department should have told Columbus to make certain specific changes, and if Columbus refused to change, should the State Board and Department have threatened to withhold funds? Now, before they can do that, they have to have some reasonable basis to believe what they have constructive knowledge of is a violation of law.

. . . . .

[W]hen we look at the recommendations that have been made to Columbus [by the State Board], all of this is a panoply of activity that has desegregation as its objective. Now, the plaintiffs claim that the State Board is totally uninterested in desegregation, that it has a policy of maintaining segregation, but I say that this is absurd and does not stand up under the evidence in this record.

The final question, a quasi question, is whether the State Board and Department could have done more. Could they have gone to Columbus and could they have demanded that certain things take place? Sure. We can all do more, but that is not the decisive legal issue. The question is not whether the State Board could have done more. The question is whether the State Board of Education had a policy of maintaining segregation, because that is what the majority of the Keyes decision talks about. Did it have segregative intent? The assessment of that question is important to the trier of facts.

. . . [T]he explanation for the State Board's failure to demand that Columbus take certain specific acts and corrective action is not due to a policy of maintaining segregation.

It is due, instead, to the State Board's belief that the Columbus Board has certain powers that are given to it by the statutes of Ohio and that the Columbus Board and its Superintendent must be allowed to exercise those powers except where the exercise is in plain violation of the law. It had reason to believe that the Columbus Board was not in violation of the law, and that is the reason that it didn't demand the things that it demanded in Middletown, the things that it demanded in Toledo, the things that it demanded in North College Hill.

The State Board and the Department do not have a policy of maintaining segregation in the State of Ohio. They could do more, but they don't have a policy of maintaining segregation in this state, and their failure to do more is not the product of a segregative or segregationist state of mind.

"The State Board and the State Superintendent are Ohio's resident experts on school desegregation matters. They have the means to collect information, which they have done, to conduct hearings, to make findings, and to enforce orders based on their findings.[7] In 1956 the Attorney

[7] R.C. § 3301.16 provides that the Board shall revoke the charter of any school district which fails to meet the minimum standards. The Board may then dissolve the district and transfer its territory to one or more adjacent districts.

The State of Ohio provides financial assistance through the School Foundation Program to all qualifying, chartered districts in the state. The funds are provided by the legislature and are allocated by the Department of Education among the districts in accordance with the provisions of R.C. § 3317.01 et seq. The Board disburses substantial federal funds to districts which qualify under different federal programs. Before a district may receive any federal funds, it must submit assurances that it is in compliance with law.

General of Ohio advised that the State Board had the primary responsibility for administering the laws relating to the distribution of state and federal funds to local school districts and that such funds should not be distributed, absent good and sufficient reasons, to local districts which segregated pupils on the basis of race in violation of Brown I.[8] The facts of this case offer no

[8] The Attorney General opined:

Following a determination by the state board of education that a school district 'has not conformed with the law' so as to require the withholding of state funds as provided in Section 3317.14, Revised Code, such board and the controlling board, acting separately, may, for 'good and sufficient reason' established to the satisfaction of each board, order a distribution of funds . . . . .

satisfactory reason for these state officials' failure to perform their duties as advised by the Attorney General. Mere 'suggestions' to the Columbus Board were not enough. These defendants cannot be heard to say that they could not understand their obligations; the Attorney General made those clear.

"Dr. Kenneth Connell, representing the Columbus Area Civil Rights Council, visited the offices of the state defendants in the spring of 1971 and requested that action be taken regarding the Columbus schools. No action was taken. As I understand the state defendants' argument, they claim that they would have investigated had Columbus school officials so requested. This position borders on the preposterous. It cannot reasonably be expected that those who violate the constitution will be anxious for an investigation in order that a remedy may be leveled against them.

"The sheer multitude of appellate court decisions cited by the parties arising from school segregation cases all over this country from 1954 until this case was at issue, coupled with notice of the racial imbalance in the Columbus schools, would have led even the most socially optimistic to suspect that Ohio's second largest city might have some problem in that regard which required attention.

"The state defendants are to be commended on the accumulation of data, advisory resumes and personnel to be used for desegregation. Dr. Robert Greer has worked long and hard in a leadership role in finding avenues designed to lead to equal educational opportunities. Information was provided to local districts, and rather gentle persuasion employed to encourage desegregation. But some firm action is needed when the horse won't drink the water.

"The failure of these state defendants to act, with full knowledge of the results of such failure, provides a factual basis for the inference that they intended to accept the Columbus defendants' acts, and thus shared their intent to segregate in violation of a constitutional duty to do otherwise."

429 F.Supp. at 262–64.

Thus, as we view the District Judge's findings (and this record clearly supports him), they rest primarily upon the failure of the State Board to order the Columbus Board to perform its constitutional duty to operate a school system which was not segregated by race.

The crucial consideration here concerns the powers and duties of the State Board. The parties agree that in 1956, as noted by the District Judge, the Attorney General interpreted this Ohio law as giving the State Board the power to withhold state funds from any school board which was operating an unlawfully segregated school system. The parties also appear to agree that this opinion (written by the present Chief Justice of the Ohio Supreme Court) is law which controls the State Board.[9]

**9.** The specific holdings of the opinion follow: "Accordingly, in specific answer to your inquiry, it is my opinion that:

1. The term 'law' as used in Section 3317.-14, Revised Code [presently codified at Ohio Rev.Code Ann. § 3307.01 (Page Supp.1977)], forbidding the distribution of state funds to school districts which have not 'conformed with the law,' is used in the abstract sense and embraces the aggregate of all those rules and principles enforced and sanctioned by the governing power in the community. Such term embraces the equal protection provision in the Fourteenth Amendment of the Constitution of the United States under which the segregation of pupils in schools according to race is forbidden.

2. The primary responsibility for administering the laws relating to the distribution of state and federal funds to the several public school districts is placed with the state board of education, subject to the approval of the state controlling board.

3. It is the responsibility of the state board of education in the first instance to determine whether a particular school district, or the board of education of such district, 'has not conformed with the law' so as to require the withholding of state funds from such district. In making such determination the state board of education should observe the requirements of the Administrative Procedure Act, Chapter 119., Revised Code, as to notice, hearing, summoning of witnesses, presentation of evidence, degree of proof, and procedural matters generally.

4. Following a determination by the state board of education that a school district 'has

The State Board does not contend that it was unfamiliar with the history and present practices of the Columbus Board in operating the school system in the state capital city.

This record does not show any act on the part of the State Board which *required* the Columbus Board to pursue the segregative policies which the District Judge and this court have found. It also does not show any action that the State Board took affirmatively to desegregate the Columbus schools or even to use its statutory powers to investigate and make findings as to whether the Columbus schools were being operated within the law.

The State Board's primary contention on this appeal is that it had no prior knowledge that the segregation existing in the Columbus schools was *unlawful* since it did not know that said segregation was derived from intentionally segregative policies on the part of the Columbus School Board. The State Board also argues that the District Judge did not make findings concerning the "incremental segregative effect" (*Dayton, supra,* 433 U.S. at 420, 97 S.Ct. 2766) of its actions upon the totality of segregation in Columbus.

■ While we believe that what we have quoted from the District Judge's opinion must be regarded as a general finding of intentional support of segregation by the State Board, it may well be argued that the *Dayton* opinion requires more detailed findings of fact pertaining to 1) the State Board's knowledge (if any) of the Columbus Board's intentional segregative practices, 2) the State Board's failure to protest or restrain them by withholding funds, 3) the State Board's continuance of support in the face of such knowledge, 4) the motivation of the State Board in failing to investigate the reasons for de facto segregation, and 5) the effect of findings if any, under 1, 2, 3

and 4 above, as suggested in *Dayton, supra* at 420, 97 S.Ct. 2766.

For these reasons and with recognition that no practical delay in ending the unconstitutional practices which we have found above will result, we now remand these cases (as they pertain to the State Board only) for further consideration, including at the option of the District Judge, the taking of additional testimony concerning factual issues enumerated above. *See Dayton Bd. of Educ. v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *see also Rizzo v. Goode,* 423 U.S. 362, 376–77, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Monell v. Department of Social Services,* 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *Arthur v. Nyquist,* 573 F.2d 134 (2d Cir. 1978).

## VIII REMEDY

The arguments of both appellants pertaining to remedy attack the systemwide remedy ordered by the District Judge solely on the ground that no systemwide constitutional violation or violations should have been found as to each appellant, and hence, no systemwide remedy should have been ordered. This argument has been dealt with at length above and has been rejected. We do not find presented to us any systemwide alternative plan for desegregation. The plan, in fact, was either devised by or approved by both appellants, although, of course, under protest as to its systemwide nature.

Under these circumstances, the plan as adopted by the District Court is approved and the judgment of the District Court is affirmed in all respects, except for the remand of the case for consideration of and findings on the impact of the constitutional violation discussed in the preceding section pertaining to the liability of the Ohio State Board of Education.

not conformed with the law' so as to require the withholding of state funds as provided in Section 3317.14, Revised Code, such board and the controlling board, acting separately, may, for 'good and sufficient reason' established to the satisfaction of each board, order a distribu-

tion of funds to such district notwithstanding such lack of conformity with the law.
Respectfully,
C. William O'Neill
Attorney General"
1956 Op.Atty.Gen. Ohio 514, 520–21.